# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| TERRY D. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07-CV-0556-AGF |
| | ) | |
| JAMES NEWTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This personal injury diversity action is before the Court[1] on two motions for summary judgment -- one was filed by Defendants A.O. Smith Corporation ("Smith") and Ryder Integrated Logistics, Inc. ("Ryder"); and one was filed by all Defendants, namely, Smith, Ryder, James Newton, and James Newton's employer, Mesilla Valley Transportation, Inc. ("MVT"). Plaintiff in this case is Terry Thomas, an employee of Milford Supply Company ("Milford Supply"). The incident which gave rise to this action occurred on September 3, 2004. Oral argument on the motions was held on November 25, 2008. For the reasons set forth below, the joint motion of all Defendants for summary judgment shall be denied, and Smith's and Ryder's joint motion for summary judgment shall be granted.

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

## BACKGROUND

For the purposes of the motions before the Court, the record establishes the following. Smith, a seller of water heaters, contracted with Milford Supply, a plumbing supply vendor, to sell Milford Supply a shipment of 40-gallon and 50-gallon water heaters. Smith and Ryder were parties to a Freight Management Services Agreement ("FMSA"), pursuant to which Ryder agreed to assist Smith in selecting carriers to transport Smith's water heaters to customers. The FMSA provided that in return for a management fee, Ryder would make recommendations to Smith of carriers and provided Smith with information of the carriers' rates and terms and conditions of freight transport. Smith would then select "Authorized Carriers," selections which would be deemed an approval of the rates, terms, and conditions communicated to Smith by Ryder regarding those carriers, as modified by any special terms and conditions specifically stated in writing by Smith at the time of selection. (Ex. A to Doc. #72.)

The FMSA explained that most, if not all, of the carriers Smith selected would already be a party to Ryder's "master contract under which the carrier provides transportation services to the customers we [Ryder] serve as agent." The FMSA further provided that Ryder would, as Smith's agent, negotiate and execute with an authorized carrier an addendum to the master contract, or if Ryder did not have a master contract with the carrier, a new contract, to transport Smith's freight at the price, terms, and conditions Smith had approved. Ryder also agreed to provide certain services after carriers were selected, such as auditing and processing payment of freight bills and

obtaining evidence that each authorized carrier maintained liability insurance. Section 7.1 of the FMSA explained as a "Fundamental Concept," that Ryder's duties under the agreement were not those of a carrier, and that the carriers, not Ryder, bore sole responsibility for the safe, timely delivery of Smith's freight. Id.

MVT was a party to a master contract with Ryder, entitled "Carrier Master Transportation Services Agreement." ("CMTSA," Ex. B to Doc. #72.) This contract provided that Ryder was acting on behalf of the shipper identified in an addendum to the contract. Pursuant to the CMTSA, MVT agreed to transport freight described in the addendum and tendered to it by the shipper, under the terms and conditions set forth in the addendum. The CMTSA specifically stated that MVT was an independent contractor, and that nothing in the CMTSA "shall be deemed to constitute" MVT and Ryder, or the shippers represented by Ryder, "as partners, joint venturers, or otherwise associated in or with the business of the other. All persons thorough whom [MVT] performs services under this Agreement shall be the employees, agents or subcontractors of [MVT] alone, not of Shipper or [Ryder]."

Pursuant to the CMTSA, MVT and Ryder further agreed that MVT:

> shall be solely responsible for the procurement and safe and lawful operation of the vehicles it uses in rendering the Services and shall also be solely responsible for the employment, training, supervision, and control of drivers, helpers and other personnel it employs therefor. . . . [MVT] shall defend, indemnify, save, and hold harmless Shipper and [Ryder] from and against any and all manner of penalties, fines, assessments, claims, losses, damages, and judgments, or any of them, arising from operation of [MVT] vehicles, [MVT] other performance, or failure to perform, under this Agreement. (Ex. B. to Joint Stip.)

Addendum A to the master agreement between Ryder and MVT named Smith as the shipper. The parties have jointly stipulated that MVT drivers could be required to assist with the unloading of Smith's water heaters. (Joint Stip. ¶13.) The record includes an unsigned Notice of Noncompliance regarding driver-assisted labor. This form (which was "created" on January 3, 2003) lists the names Ryder, Smith, and MVT on top and states that due to MVT's continued non-compliance with the driver-assisted labor responsibility, Ryder was again outlining the current policy, as follows: (1) MVT drivers were contractually required to advise the customer of the availability of assistance to unload the product; (2) unless physically incapable, drivers were contractually required to assist in the unloading of the product; and (3) where the driver was not physically capable to assist in the unloading of the product, an alternate laborer could be employed at MVT's expense, but that this alternate laborer must accompany the driver to the pre-determined delivery destination. The notice required MVT to comply with the driver-assist agreement no later than April 15, 2003, and to provide written notice to MVT of such compliance. (Ex. C to Doc. #72.)

On September 3, 2004, Newton transported the water heaters at issue to Milford Supply in a semi-tractor trailer. The water heaters were stacked two-high in the trailer, with one row of water heaters stacked on top of the other row. The 40-gallon water heaters weighed approximately 80 pounds; the 50-gallon water heaters weighed approximately 100 pounds. Once the water heaters were down-stacked, Plaintiff and other employees of Milford Supply were to bring them on dollies into the Milford Supply

4

warehouse. A DVD prepared by MVT and disclosed through discovery shows the process to be used by MVT truck drivers to downstack a load of Smith water heaters. (Ex. F. to Doc. #68.)

A typed notation on the bill of lading for the water heaters in question states, "Driver must assist unloading heaters"; a handwritten notation dated September 3, 2004, states that the top row of water heaters was unloaded by Milford Supply, "Driver Assist." (Ex. E to Joint Stip.)  It was Newton's understanding that it was his responsibility to downstack the water heaters.

The complaint alleges that while downstacking one of the water heaters, Newton began to drop the water heater and Plaintiff rushed to his aid. The complaint alleges that as Plaintiff did so, another water heater struck Plaintiff on the head and caused him to fall to the ground and sustain injuries. Plaintiff's four-count second amended complaint charges each Defendant with negligence (Count I: MVT; Count II: Ryder; Count III: Smith; Count IV: Newton), and alleges that all Defendants acted as agents for one another.

## DISCUSSION

### Summary Judgment Standard

"Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"

Erenberg v. Methodist Hosp., 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986)). An issue of material fact is genuine if it has a real basis in the record; and a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the non-moving party "must demonstrate that at trial it may be able to put on admissible evidence proving its allegations." JRT, Inc. v. TCBY Sys., Inc., 52 F.3d 734, 737 (8th Cir. 1995).

**Motion for Summary Judgment of Defendants Smith and Ryder**

The parties acknowledge that Missouri law governs this diversity case. The task of a federal court sitting in diversity is to attempt to predict how the forum state's highest court would resolve a question which it has not squarely decided. Allstate Ins. Co. v. Blount, 491 F.3d 903, 908 (8th Cir. 2007). Under Missouri law, "[a]n independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Williamson v. Sw. Bell Tel. Co., 265 S.W.2d 358, 358 (Mo. 1954) (citation omitted); see also Scott v. SSM Healthcare St. Louis, 70 S.W.3d 560, 566 (Mo. Ct. App. 2002). "Stipulations which entitle the employer to exercise a certain measure of control over the work, but go no

6

further than to enable him to secure that it shall be properly performed" do not necessarily undermine the status of the party as an independent contractor. Williamson, 265 S.W.2d at 363.

"Someone who contracts for the services of an independent contractor is generally not responsible for the wrongs committed by an independent contractor." Hougland v. Pulitzer Pub. Co., 939 S.W.2d 31, 33 (Mo. Ct. App. 1997). In contrast to this rule on independent contractors, the doctrine of respondeat superior imposes upon a principle vicarious liability for the negligent acts or omissions of its agent that are committed within the scope of the agency. Scott, 70 S.W.3d at 566. "Two elements are required to establish an agency relationship: (1) the principal must consent, either expressly or impliedly, to the agent's acting on the principal's behalf, and (2) the agent must be subject to the principal's control." Id.

Here, in entering into the CMTSA/Smith Addendum with MVT, Ryder was acting as an agent for Smith. But the question is whether MVT was acting as an agent of Ryder, and hence of Smith, or as an independent contractor. If MVT was acting as an independent contractor, Smith and Ryder cannot be liable for negligence on the part of MVT and/or Newton, and would be entitled to summary judgment.

Plaintiff argues that a genuine issue of fact exists as to the nature of the contractual relationship between Ryder and MVT and whether there was an agency relationship among Defendants. It is undisputed, however, that neither Smith nor Ryder exercised control over MVT as to whom MVT hired or in how MVT employees performed in

7

making deliveries and assisting with the unloading. The Notice of Noncompliance did not deal with how MVT's drivers performed, but rather with what the drivers were contractually obligated to do. Moreover, the contract between Ryder/Smith and MVT clearly states that MVT was an independent contractor.

Plaintiff maintains that MVT's DVD showing the proper way to unload Smith water heaters indicates that the relationship between MVT and Smith was more than that of an employer to an independent contractor. Plaintiff also argues that the CMTSA providing that Ryder would measure the activity, performance, quality, and consistency of the services MVT was providing, along with the Notice of Non-Compliance sent from Ryder to MVT, show that MVT was more than an independent contractor and was in fact an agent of Ryder, and hence of Smith.

The Court does not agree. Although the agreement between MVT and Ryder indicates that Ryder could monitor that MVT met its contractual obligations, this does no more than allow Ryder to ensure proper performance and does not undermine MVT's status as an independent contractor. Nor does the DVD prepared by MVT change MVT's status.

Plaintiff also argues that evidence exists to show the Plaintiff is entitled to recover from Smith and Ryder "under a theory of negligent entrustment, and due to their relationship as joint venturers in the delivery of the water heaters at issue." These theories were not pleaded, and were raised for the first time by Plaintiff in his response to the motion for summary judgment, after discovery has closed. Claims raised for the first

8

time in response to a motion for summary judgment are not properly before the court. See, e.g., Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 988 (11th Cir. 2001) (stating that a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment). Nor is there any evidentiary support in the record for such a claim. Accordingly, the Court finds that Smith and Ryder are entitled to judgment as a matter of law.

**All Defendants' Joint Motion for Summary Judgment**

This leaves the question of whether MTV and Newton are entitled to summary judgment. Under Missouri law, "[a]ctionable negligence requires a causal connection between the conduct of the defendant and the resulting injury to the plaintiff." Zafft v. Eli Lilly & Co., 676 S.W.2d 241, 244 (Mo. 1984). In support of all Defendants' joint motion for summary judgment, Defendants argue that Plaintiff has produced no evidence of any negligent act or omission on the part of any Defendant, and more specifically, no evidence to show that Newton's alleged loss of control of the box he was downstacking was due to a failure to exercise due care. They argue that Plaintiff has no evidence of what caused the accident, just speculation to impute causation to Defendants.

Defendants argue, in the alternative, that they are entitled to summary judgment because Plaintiff made the decision to place himself in a position of harm to avoid damage to property, and that the "rescue doctrine" recognized by Missouri Courts prevents a plaintiff from asserting claims against a defendant for negligence where the plaintiff acted to save the property – rather than the life or the limb – of another. They

9

point to Plaintiff's deposition testimony that he "came forward . . . to try to grab the bottom of the box before it hit the ground, because if the bottom of the heater hits the floor, it's damaged," and that he would not have been blamed for any damage to the heater, had Newton allowed the heater to drop. (Doc. #62, Ex. B at 291-92.) Prior to that testimony, Plaintiff testified that he was 6' tall and that Newton was in his 50s and was maybe 5' 5". Plaintiff said that Newton was "a little guy . . . [t]hat's why I was trying to help him out." Plaintiff personally downstacked at least two 50-gallon water heaters and then when he got to the 40-gallon heaters, he asked Newton if Newton could handle it, and Newton said he could. When Newton was trying to take the 40-gallon box off of the top row, Plaintiff was a couple of feet away, "just far enough to be out of his way." Plaintiff said he stepped back to watch because he did not want Newton to hurt himself, and "sure enough . . . he started dropping it." Plaintiff reached out and bent forward to try to catch the bottom of the 40-gallon water heater to prevent the heater "before it hit the ground, because if the 40-gallon heater hits the ground, they're dented, they're no good anymore."

The deposition testimony of Plaintiff, Newton, and other Milford employee's at the scene differ as to what happened next. Plaintiff testified that another box hit him on the head while other witnesses said that it was the box Newton was downstacking that struck Plaintiff. Plaintiff testified that after he was hit, he got up and started to walk around and Newton followed him around, apologizing. After a little while, Plaintiff drove himself to the hospital. According to Plaintiff, the accident occurred because

10

Newton was not physically prepared to do his job. Other Milford employees testified that Newton developed breathing problems and was not able to down-stack the entire load without the Milford employees' assistance. Newton testified that he sometimes brought someone along with him to help him unload a trailer, but that he did not do so on the day in question.

Upon review of the summary judgment record, the Court concludes that genuine issues of material fact remain as to Plaintiff's claims against Newton and MVT for negligence. Although Plaintiff alleged in the second amended complaint, and testified by deposition, that a box other than the one that Newton was downstacking hit Plaintiff, other witnesses maintained that it was the box that Newton was downstacking that hit Newton. At oral argument, counsel for Plaintiff acknowledged that only one box was on the ground at the scene of the accident and that Plaintiff might have been mistaken as to the involvement of a second box. If indeed a second box hit Plaintiff, MVT's and Newton's negligence in the matter becomes more speculative. But issues of fact for the jury remain as to the facts surrounding the accident and whether MVT and/or Newton were negligent in handling the shipment.

With regard to Defendants' rescue-doctrine argument, the Court agrees with Defendants that this doctrine has continued application in Missouri even after the adoption in Missouri of comparative fault in 1983. See Allison v. Sverdrup & Parcel & Assocs., Inc., 738 S.W.2d 440, 450-51 (Mo. Ct. App. 1987). The Court concludes, however, that viewing the evidence in the light most favorable to Plaintiff, it is not clear

that Plaintiff's only motive for stepping in to assist Newton was to prevent damage to a water heater. A jury could find that Plaintiff was also concerned that Newton might get hurt.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the motion for summary judgment filed by Defendants Smith and Ryder is **GRANTED**. [Doc. #60]

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by all Defendants is **DENIED**. [Doc. #63]

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of December, 2008